1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF MISSOURI
2

3  VOICE TECH CORPORATION,

4          Plaintiff,                Docket No. 4:20-cv-00111-RK

5    v.

6  MYCROFT AI, INC.,                 Kansas City, Missouri
                                     April 14, 2020
7          Defendant.

8

9                ........................

10            TRANSCRIPT OF ORAL ARGUMENT
         BEFORE THE HONORABLE ROSEANN KETCHMARK
11            UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21
       Proceedings recorded by machine shorthand, transcript
22  produced by computer-aided transcription.
   _____
23              Jean M. Crawford, RDR, CRR
               United States Court Reporter
24             400 East Ninth Street, #8420
               Kansas City, Missouri 64106
25                   816.512.5642

```
 1  APPEARANCES:

 2

 3   For the Plaintiff:          Mr. Tod T. Tumey
                                 Mr. Eric Michael Adams
 4                               Mr. Silachi Nwogwugwu
                                 Tumey L.L.P.
 5                               5177 Richmond Avenue
                                 Suite 1188
 6                               Houston, Texas 77056

 7                               Ms. Stacey R. Gilman
                                 Berkowitz Oliver LLP
 8                               2600 Grand Boulevard
                                 Suite 1200
 9                               Kansas City, Missouri 64108

10

11   For the Defendant:          Mr. Allen Justin Poplin
                                 Mr. Hissan Anis
12                               Avant Law Group
                                 12980 Metcalf Avenue, Suite 180
13                               Overland Park, Kansas 66213

14                               Mr. Christopher M. DeBacker
                                 Law Office of Mark Brown, LLC
15                               7225 Renner Road
                                 Suite 201
16                               Shawnee, Kansas 66217

17

18

19

20

21

22

23

24

25
```

1          (Proceedings commenced at 3:03 p.m.)

2          THE COURT:  Good afternoon.  This is Roseann

3  Ketchmark.  We are on the record.  And the Court is calling

4  case No. 20-cv-00111, Voice Tech Corp. versus Mycroft.

5          Mr. Phillips, are you able to hear me?

6          THE LAW CLERK:  Yes, Judge.

7          THE COURT:  All right.  Let me first note that today

8  is April 14th, 2020.  It's 3:00 in the afternoon, Kansas City,

9  time.  And we are here for oral argument on plaintiff's motion

10  in document 14, plaintiff Voice Tech Corporation's motion for

11  relief to require decorous and civil conduct by the parties.

12          Let me first ask for entry of appearances by

13  attorneys for the plaintiff.

14          (Simultaneous cross-talking.)

15          MS. GILMAN:  I'm sorry, go ahead.

16          MR. ADAMS:  No, no.  Go ahead, Stacey.

17          THE COURT:  Ms. Gilman.

18          MS. GILMAN:  This is Stacey Gilman on behalf of

19  Voice Tech Corporation.  Would you like individual appearances,

20  or do you want me to run through our staff?  We've got Tod

21  Tumey, Eric Adams, David Wooten, and Silachi -- and I'm going

22  to apologize in advance for butchering his last name --

23  Nwogwugwu from the Tumey firm also on the line on behalf of

24  Voice Tech Corporation as well as Mo Khan from my firm.  And I

25  just want to note for the record, Mr. Khan is a 2018 graduate

from Georgetown and has just moved here from Colorado. He is
not a member yet of the Missouri bar. His application is
pending, and so I wanted to make sure that it's okay with the
Court that he be at the hearing before he entered his
appearance officially.

THE COURT: Absolutely. That's fine. Thank you for
that, Ms. Gilman. Anyone else for plaintiff?

All right. Let me get entry of appearances for
defense, beginning with Mr. DeBacker.

MR. DeBACKER: Yes. This is Chris DeBacker, Your
Honor, from the law firm Mark Brown on behalf of the defendant
Mycroft AI. Also on the line is Justin Poplin and Hissan Anis
from Lathrop GPM.

THE COURT: Very good. Anyone else? Anyone
witnesses? Anyone else on the line?

All right. I have had an opportunity to read
plaintiff's filings in document 14 and their suggestions in
document 15 as well as several exhibits and also the
defendant's opposition in document 20 with the exhibits as
well. So I guess I'd like to hear from both sides.

But what my focus today is going to be on is whether
or not plaintiff has shown that the defense or any agents has
harassed plaintiff or counsel for plaintiff. And if there
hasn't been a showing, I think the second level would be, was
it foreseeable that defendant's conduct would cause such

1   harassment.

2          So that's kind of my focus.  But I'm open to

3   whatever issues the parties want to include in their arguments.

4   And I anticipate your arguments -- since I've read the

5   complaint, the pleadings, reviewed the exhibits, that each side

6   would argue about ten minutes.

7          Ms. Gilman, will you be leading the arguments or

8   will one of your co-counsels?

9          MS. GILMAN:  I'm going to turn it over to Eric Adams

10  to take the lead on this, Your Honor.

11         THE COURT:  Very good.  Mr. Adams, are you ready to

12  proceed with your statement, or do you have any issues we need

13  to take up ahead of time?

14         MR. ADAMS:  I'm ready to proceed, Your Honor.

15         THE COURT:  All right.  Mr. DeBacker, will you be

16  the lead in the argument or will someone else?

17         MR. DeBACKER:  Yes, Your Honor, it will be me, Chris

18  DeBacker, Your Honor.

19         THE COURT:  And, Mr. DeBacker, do you have any

20  issues that we should take up before I turn it back over to

21  Mr. Adams?

22         MR. DeBACKER:  None at this point, Your Honor.

23         THE COURT:  All right.  Mr. Adams, you may proceed.

24         MR. ADAMS:  Okay.  Thank you, Your Honor.  May it

25  please the Court.  I want to jump in and start addressing the

questions by the Court right away.  We, of course, outlined

this in our Exhibit 97, which is a timeline of different

events.  Each event is laid out in detail, and then the exhibit

that is associated with that event has also been submitted to

the Court.  That's a good, kind of, road map of all of the

events that have taken place that we're complaining about.

Really, the story -- to kind of focus in on the

Court's question -- really starts at the end of January.  We

served Mycroft with the lawsuit in Texas at the end of January.

And then, within a few days of that, we started getting

harassing phone calls at our firm.  Somebody would call, heavy

breathing, hang up, and then this just was repeated over and

over again.  That's -- and we put this in our suggestions, it's

actually very unusual for our firm.  We're just a small patent

boutique down here in Houston.

A few days later, we saw that Josh Montgomery, one

of the co-owners of Mycroft and one of the -- or I guess he was

a former CEO -- he's now something called a first officer --

submitted a -- I guess published an article on Mycroft's

website critical of us, using some slurs against us, calling us

patent trolls and explaining his feelings about the case.  But

at one point, he also points out that he thinks Tod Tumey, one

of the attorneys, is a patent troll, and he knows how to handle

them.  And he says you should stab -- or I know how to handle

them.  Stab, shoot and hang them, and then dissolve them in

acid.  So that was the -- the first threatening language that
we saw come from Mycroft.

Now, after that, a few days later, there was this
flood of attempts to try to hack into our systems, different
online harassment, you know, signing us up for email lists,
pornography websites, all kinds of activity that stretched over
about a seven-hour period.  And a lot of that was -- or that
was all anonymous.  There were a few individuals from third
parties who did email us in response to Mr. Montgomery's
article, but they all identified themselves.

And if the Court looks at the timeline that I
referred to, Exhibit 97, it's clear, looking at February 8th,
2020, that this seven-hour tirade is all one person.  You can
see it in the pattern.  You can see how they're going through
different activities.  At one point, they're trying to access
different accounts for our firm.  At one point, they're signing
us up for pornography websites.  Another point, email lists.
And there's just a pattern to it, which indicates that it's one
person.

After that, we looked at it, and we thought, you
know, this has got to be somebody at Mycroft.  Who else would
be motivated to do this.  We strongly suggested it was Josh
Montgomery or somebody helping him at Mycroft.  And we decided
that it would be best to move this case to Missouri.  And we
decided to dismiss the Texas case.  So we dismissed it.  And

1    then all of a sudden, all the online attacks stopped.

2          And we refiled it, of course, in this court and

3    moved forward.  As soon as Mycroft made an appearance, we filed

4    this motion for relief.  And a few days later, after filing

5    that motion for relief, the attacks started up again.  We had

6    somebody try to hack into our systems at our firm and somebody

7    was signing us up for online solicitation from companies,

8    basically claiming to be us and saying that we were interested

9    in their goods, so please give us as call.  So to us, the

10   timing of this is a major indication that this is somebody at

11   Mycroft, most likely Josh Montgomery.

12         The fact is, you know, as soon as we dismissed the

13   case, these attacks stopped.  As soon as we filed our motion

14   for relief, they started up again.  And it's just -- it's just

15   not likely that some random third party is following this case,

16   has access to Pacer filings, has access to high key Law360

17   articles and is monitoring this case daily.  And as soon as we

18   do something that they approve of, the attacks stop.  As soon

19   as we do something they don't approve of, these attacks start

20   up suddenly again.

21         So the evidence that we have that we've presented to

22   the Court is -- is circumstantial, but it is strongly

23   indicative of this being somebody at Mycroft performing these

24   online attacks.  And really, what we're asking for here is we

25   just want to set a baseline of behavior going forward.  We

1    shouldn't have to deal with these kind of attacks.  We want,

2    you know, everybody to agree let's just treat each other

3    professionally, with courtesy, and focus on the merits of the

4    case.  We don't -- we didn't want to wait a year and then have

5    these attacks just get unbearable and go back to the Court with

6    everyone asking, well, if it were such a big deal, why did you

7    wait so long.  So that's why we're bringing it up now at the

8    beginning of the case.

9              As far as whether -- well, we believe it was Mycroft

10   or, most likely, Josh Montgomery.  I know the Court had a

11   second question, whether this would be foreseeable that this

12   kind of conduct would lead some third party to act this way.

13   The fact is, these attacks did happen, and we've submitted the

14   evidence to support it.  And so I think it's very clear that at

15   the very least, the evidence incited someone to act this way,

16   if it was not Josh Montgomery, someone at Mycroft.

17             THE COURT:  All right.  Thank you.  And let me

18   ask --

19             MR. ADAMS:  And --

20             THE COURT:  Were you through?  I'm sorry.

21   Mr. Adams, were you through?

22             MR. ADAMS:  Yes, Your Honor, I am.  Thank you.

23             THE COURT:  All right.  I have a few questions.  As

24   part of your prayer for relief in your document 14 motion, you

25   asked that the defendant be required to remove comments that

1 they've published that threaten or suggest or incite violence.

2 That is still -- that remains your position; is that correct?

3       MR. ADAMS: Yes, Your Honor. That's a reference to

4 the initial article that Mr. Montgomery published on Mycroft's

5 website. The reference is to stab, shoot and hang them and

6 dissolve them in acid. And it's just that sentence.

7       THE COURT: What about "punch him square in the face

8 and nuke them from orbit?

9       MR. ADAMS: The "nuke them from orbit" is -- you

10 know, is an obvious reference to a movie line. We're not

11 concerned about that. "Punch him in the face" would be a

12 threat, not as serious, but it should be removed as well. And,

13 like I said before, we're not trying to make them take down

14 this complete article. If they have criticisms of us, they're

15 free to make those known. We're not trying to put any kind of

16 gag order on them. We just want that one little threat taken

17 out. We just think it sends the wrong message. And that's the

18 limit of our request.

19       THE COURT: All right. Thank you.

20       All right. Mr. DeBacker. You may proceed.

21       MR. DeBACKER: Thank you, Your Honor. And may it

22 please the Court. I just wanted to first, you know, latch on

23 to the -- the fact that they do admit that it's circumstantial

24 evidence. And we've submitted a declaration of

25 Mr. Montgomery's categorically denying any of this activity.

1 And, you know, Mycroft would be the first to formally

2 admonish and deny any of these personal attacks.  They don't

3 believe that anybody, counsel, companies should be subjected to

4 this type of harassment.  And it's fitting -- I found out

5 earlier today that today is national be kind to lawyers day, so

6 it's something that attorneys sometimes have to deal with in

7 the face of these situations.  But nobody should have a

8 threatened attack and phone calls and harassment.  But there is

9 no evidence whatsoever that any of these activities were

10 performed by Mycroft or Mr. Montgomery or any person instructed

11 to do these attacks by Mr. Montgomery.

12         You know, we would certainly be interested in seeing

13 the digital file of these emails in discovery and seeing if

14 maybe we can't identify these particular parties for the

15 plaintiff.  Mycroft has resources and some technical experience

16 that they could potentially track down these individuals.  But,

17 you know, they asked who else would be motivated to do this.

18 And, you know, as we pointed out in our response in opposition,

19 there is a large segment of the technological society and

20 inventors all over the country that are against the type of

21 activity that Mycroft is of the opinion Voice Tech is taking on

22 here.

23         The tautologism is patent troll.  You know, the

24 courts have used that term, Congress has used that term to

25 describe nonpracticing entities and these individuals that --

1   the language that the plaintiff is locked in on, the "stab,

2   shoot and hang them and then dissolve them in acid" --

3   Mycroft's position is that's referring to the fictional

4   creature of the troll, has to deal with the troll.  And the

5   quote itself is actually written to another article unrelated

6   to this matter.  So Mycroft doesn't view that as any sort of

7   language that -- other than hyperbole that would direct

8   somebody to perform these types of act.

9           And Mycroft would like to point out also that

10  they're -- they have nine full-time employees.  They're going

11  up against giants like Google and Amazon.  And they are the

12  defendants here.  They didn't bring this case.  So that's

13  paramount to why they need the ability to inform their

14  customers, inform their investors.  And we're glad to hear that

15  the plaintiff isn't suggesting a full gag order here.  But it

16  seems like really that language is what they're latching on to.

17  And I don't know that removing by word is going to stop some

18  individual out there on the internet who has a strong opinion

19  about, you know, patent -- abusers of the patent system

20  from defensively continuing this activity, which Mycroft cannot

21  control and cannot stop.  But at the same time having First

22  Amendment rights to express its opinion and to continue

23  informing its communities about the ongoings of the case,

24  informing its customers, and it will continue to provide

25  quality product to -- you know, continue to assure its investor

1   that they're going to defend this type of case and all future

2   types of cases like this against what they consider an attack

3   on their own business.

4           So while they are not aware of this activity that is

5   being accused of, they deny any form of activity.  They did

6   not -- they did not participate in any of the activity.  They

7   did not contact Mr. Tumey or his firm.  None of the online --

8   you know, the signing up for various services or attempts to

9   hack their website can be proven to have come from Mycroft or

10  any of its associates.  And they categorically deny any of that

11  activity in Mr. Montgomery's declaration.  And that pretty much

12  sums up our position on this matter.

13          THE COURT:  All right.  Here is where the Court is

14  landing.  In your Exhibit 5 to your opposition in your document

15  20, in that exhibit, it is a posting by Techdirt.  And one of

16  the sentences in that writing -- the paragraph begins with, As

17  Tumey recounts, the various angry, immature, internet trolls

18  then did a bunch of other mean stuff to Tumey, such as signing

19  him up for mailing lists.  This is, again, childish behavior,

20  but it's kind of what often happens when you do something

21  stupid and the internet finds out about it.

22          And I find that there is sufficient evidence that

23  the harassment that plaintiff's counsel has received is induced

24  or inspired by the postings of Mr. Montgomery.  In particular,

25  the initial blog posting on February 5th where his -- the

posting is, basically, I want you to do something for me.  And

he says, I'd like -- I don't often ask this, but I'd like for

everyone in our community to share the post in any which way

they can.  And so that is what -- he is calling folks into

action to get the word out.

          And then as he describes and educates the readers as

to what a troll is, then he explains what their internal

policy -- how they're going to combat this.  And he describes

it in equating plaintiff as a bully and the language of

punching a bully in the face; stab, shoot, hang them; and

dissolve them in acid; and nuke them from orbit; and that he is

turning into a hunter, a troll hunter.  I think that even

though he may not be directly the source of the harassment, his

actions are foreseeable and that that is what would happen

based on his conduct.

          So I am going to order, at least for the pendency of

this case, or until ordered otherwise, for defense to

assertively take down the sentence that begins with "I don't

often ask this," to delete that portion until the section where

"a brief history of patents in the United States."  I'd also

order defense to assertively search and take down in those

similar -- whether it's Facebook or blogs or whatever, the

remainder of the writing beginning with "the thing is, once you

pay the bully, he just comes back again and again and again."

And so from that sentence -- that can stay in, but where it

begins with "Eventually, the lunch money adds up to a lot more than a doctor's visit." From "eventually" until the end of that posting, for that to be deleted. And I do -- I'm not asking that all that blog be taken down, just those sections.

I don't know that a written order is required and that this on-the-record order should be sufficient. But I want to give each side an opportunity to make any requested changes to my order. Let's start with plaintiff.

MR. ADAMS: Your Honor, we're fine with your order being in the record being taken down by the court reporter. And we don't have any other recommendations or suggested changes to it.

THE COURT: All right. Defense?

MR. DeBACKER: Yes, Your Honor. I just wanted some clarity. To remove the sentence starting from "I don't often ask this" through the link and the posting. And then the sentence near the end starting with "Eventually, that lunch money adds up" through the end of the -- the post; is that correct?

THE COURT: Yes. So they need to take down "I don't often ask this, but I'd like for everyone in our community who believes that patent trolls are bad for open source to repost, link, tweet, and share this post. Please help us to get the word out by sharing this post on Facebook, LinkedIn, Twitter, or email." All of that is to be deleted.

1    In addition, towards the end, beginning with,

2    "Eventually, that lunch money adds up to a lot more than a

3    doctor's visit."  And that continues on.  And to take down the

4    remainder, which includes Tod Tumey's confidential

5    correspondence information and the email 1, 2, 3, email 4,

6    final notice letter link.  And then there shouldn't be any need

7    for the image attribution.  Does that clarify your concern?

8    MR. DeBACKER:  Yes, Your Honor.

9    And I -- also, if I may, Mycroft is sort of an open

10   source network.  And they do often post asking for support in

11   situations such as the (inaudible) and other things.  Is that

12   going to be an issue?

13   THE COURT:  I didn't clearly understand what you

14   said.  That they asked for support in what manner?  Tell me

15   again.

16   MR. DeBACKER:  So often -- they are part of an open

17   source network that collaborates with other open source

18   innovators.  And I just want to be clear that they're going to

19   be able to continue to ask for support outside of this matter

20   with sharing links and such with their open source network, if

21   they post on other forums, if they're going to be allowed to

22   request aid and other things like that, as long as they're not

23   directing it towards codes like this.

24   THE COURT:  Well, I'll just have to see it as it

25   comes.  I don't want to have to rule on that now.  I know just

1   in my own little messing around on my phone, I see that they

2   may be seeking financial assistance with attorneys' fees.  You

3   know, that I'm not -- that doesn't have anything to do with

4   this issue.  So I don't know what else you're referring to, but

5   just -- I mean, I think it's common sense what the Court's

6   focus is.

7           MR. DeBACKER:  That should be sufficient, Your

8   Honor.  Thank you.

9           THE COURT:  All right.  And, you know, on the word

10  patent trolls, that really is -- it was on *60 Minutes* as well.

11  I saw a little piece -- I think it was *60 Minutes*.  I think

12  that is -- I'm not going to rule that they are not able to use

13  that term in any of their communications.  So that part -- if

14  that is part of the plaintiff's request, that is denied.

15          Let me ask plaintiff, are there any other requested

16  relief?

17          MR. ADAMS:  No, Your Honor.

18          THE COURT:  Okay.  Anything further from plaintiff?

19          MR. ADAMS:  No, Your Honor.

20          THE COURT:  Defense, anything further?

21          MR. DeBACKER:  No, Your Honor.

22          THE COURT:  Let me ask the attorney in chambers

23  that's assigned to manage this case, Mr. Phillips, are there

24  any other issues or clarifications we need to take up before we

25  end the conference call?

1    THE LAW CLERK:  Just one thing, Judge.  The record

2  speaks for itself.  So my understanding is we're not going to

3  follow this up with a written order from the Court, but we will

4  follow it up with just a notation from me on the docket sheet

5  that is a minute entry that just described what was discussed

6  and will essentially state as ruled on record.

7    THE COURT:  Yes.  Without getting into any of the

8  details.

9    THE LAW CLERK:  Right.

10    THE COURT:  Okay.  Anything else, Mr. Phillips, you

11  can think of that we need to take up?

12    THE LAW CLERK:  No.  I think that's it.  Thank you,

13  Judge.

14    THE COURT:  Okay.  Everyone.  Thank you very much.

15  And this will end our conference call.  Goodbye.

16    (Proceedings concluded at 3:32 p.m.)

17                    * * * * *

18                    CERTIFICATE

19    I certify that the foregoing is a correct transcript

20  from the record of proceedings in the above-entitled matter.

21

22  April 20, 2020

23

24                    /s/Jean M. Crawford
25                    JEAN M. CRAWFORD, RDR, CRR
                       United States Court Reporter